Larkin, J.
This appeal centers on a dispute over money owed for goods sold and delivered by the plaintiff, Advanced Systems Laboratories, Inc. (hereinafter referred to as the “seller”) to the defendant, Data General Corporation (hereinafter referred to as the “buyer”) in which the seller seeks to recover $8,896.60 interest and costs from the buyer.
Neither party contests that on July 16, 1979 the buyer ordered over the telephone 250 transformers from the seller referencing a “Purchase Order No. 10513.” The crux of the instant appeal lies in the resolution of the following factual dispute. The seller introduced business records and evidence of a previous course of dealing between the parties which, in its view, tended to show that the buyer had actually ordered 250 transformers, denominated buyer’s part “#900064.” In opposition, the buyer introduced both its own business records and the testimony of a former Data General employee, one Donald Pachico, the individual who made the critical phone call, indicating that part “009697” was the one which was actually ordered.
At trial, the buyer produced a written confirming order issued to the seller on or about August 1,1979 which specifically refers to “250 transformers, part #009697; date ordered July 16,1979;” “DO NOT DUPLICATE” and “Purchase Order No. 10513.”The seller does not contest the existence of its receipt of the written confirmation.
The seller produced evidence through its President, Dr. Vladimir Horvat, seeking to explain that although the aforementioned written purchase order was also numbered 10513, it had a different part number, price term and “ship-to-location” than the seller’s business record of the July 16, 1979 oral order. In addition, Dr. Horvat admitted that his company kept different model numbers than the buyer which could have contributed to the confusion. Additional evidence was presented indicating that the buyer did not always confirm oral orders with a writing, but that it did occasionally place orders by way of the confirmation memorandum. There was further evidence that it was also not unusual for the buyer to change order numbers. Proceeding upon the written confirmation as if it were an offer to buy additional transformers, the seller filled the order. In short, from the seller’s viewpoint, two contracts existed — one for the purchase of250 transformers part “#900064” and one for *66 250 transformers part “#009697" and therein lies the essence of the confusion and the resultant litigation.
Both sides produced conflicting evidence concerning the original telephone conversation. Dr. Horvat produced the seller’s own business records which indicated that the phone order of July 16, 1979 from Don Pachico was for purchase order “#10513,” 250 transformers “#900064” Revision F for shipping to Southboro, Mass. “Revision F” identified the fifth change in production of part “#900064.” Significantly, part “#009697” was not accompanied by a revision letter because it had never been modified. The seller also presented evidence of the buying history with respect to the parts in issue. Part #900064” was generally ordered in much larger quantities than part “#009697” and the buyer had never purchased as many as 200 of the 0p9697’s previously.
The two transformers were both custom designed by the seller for us in the buyer’s New Jersey subsidiary (formerly Digital Computer Controp). It was undisputed that the buyer would have no further use for these product lines after October 1, 1979, when the New Jersey subsidiary would become independent. For his part, Pachico maintained that he orally ordered part “#009697” when he made the critical telephone call. He argued that the aforementioned written confirmation supported his recollection.[1]
From approximately August 31,1979 to October 4,1979 the seller shipped the buyer 250 transformers part “#900064,” purchase order “#10513.” No “#009697” transformers were ever shipped. Pachico testified that shortly after the buyer’s receipt of the “#900064” transformers he telephoned the buyer to notify it of the improper delivery. A letter from Dr. Horvat dated October 17, 1979 recognized that a problem concerning the order existed. In response, Pachico mailed a letter dated October 31,1979 indicating that the buyer would not accept the shipment. A letter dated November 5,1979 confirmed that the seller received notice of the disputed shipment during October 1979. Thereafter, on November 29, 1979, a letter from Pachico was received by the seller cancelling purchase order “#10513.” The seller considered this letter as cancelling the “second” order of the “#009697” parts. Of course, according to the buyer, both in legal contemplation, as well as reality, this was the only order which had been made.
The buyer, through Pachico, attempted to obtain authorization to return the 250 transformers part “#900064.” No authorization was granted until late 1980 when the seller notified Dun & Bradstreet that it was willing to accept the return of the transformers. According to the buyer, since this authorization did not arrive until somewhere between twelve and fourteen months after its rejection of the goods, it had been previously forced to dispose of the transformers as scrap.
Following the events outlined above, the plaintff-seller filed suit in the District Court on July 30,1981 seeking payment on an account annexed. A trial was held in the District Court on October 18, 1982. Following the trial, judgment was entered for the plaintiff-seller in the amount of $8,896.00 plus interest and costs. At the request of the seller, the court entered the following rulings of law:
1. The said letter was not a timely rejection made with areasonable amount of time in accordance with M.G.L. Chapter 106, Section 2-602 (1). (Reference is to the October 31,1979 letter from buyer to seller).
2. The Defendant has not made any payments for the said goods *67 accepted and received from the Plaintiff in accordance with his legal obligation as stated in M.G.L. Chapter 106, Section 2-301.
3. The oral contract between the parties is enforceable and is not barred by the Statutes of Frauds as stated in M.G.L. Chapter 259, Section 1 and M.G.L. 106, Section 2-201.
4. The parties are merchants according to the terms of M.G.L. Chapter 106, Section 2-104 (1).
5. The Defendant was under a duty to return, resell or store the goods received from the Plaintiff in accordance with M.G.L. Chapter 106, Section 2-603 and 2-604.
6. The Defendant breached his above described duties with respect to the goods delivered to the Defendant.
7. The Plaintiff has suffered damages as a result of thé Defendant’s breach and these damages.
These rulings generate the issues here on appeal which we now proceed to consider seriatim.
The defendant maintains that no contract arose in the present case due to the parties’ failure to agree on the subject matter of the agreement. In approaching this issue, we accord deference to the trial court which saw and heard the witnesses, had the opportunity to evaluate their testimony and had the option of what evidence to credit. Kaplan v. Bessette, 357 Mass. 233, 257 N.E. 2d 926 (1970). See also New Boston Garden Corp. v. Board of Assessors of Boston, 383 Mass. 456, 420 N.E. 2d 298 (1981). We may not review questions of fact found by the trial judge where, as in this case, the findings are supported by rational inferences supporting a reasonable view of the evidence. T.L. Edwards, Inc. v. Victor G. Fields, 371 Mass. 891 (1976). Accordingly, on this point, we affirm the judge’s finding that a contract existed.-
Under the Uniform Commercial Code (Mass. G.L. c. 106, § 1-101 et seq.) which governs this case, “a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.” G.L. c. 106, § 2-204 (1). Kleinschmidt Div. of S.C.M. Corp. v. Futuronics Corp, 395 N.Y.S. 2d 151, 363 N.E. 2d 701 (1977). In this case, neither party seriously disputes that some contract was contemplated. The buyer, however, maintains that due to the lack of subjective intent to agree on the specific product contemplated by the contract, no real agreement ever occurred.
“Agreement” is a term defined under the Uniform Commercial Code. It means “the bargain of parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance ... ”G.L. c. 106, § 1-201 (3) (emphasis supplied). (Massachusetts Annotations indicate the definition is consistent with but broader than Section 3 of the RESTATEMENT OF CONTRACTS). Both Section 2^204 and 1-201 (3) indicate that the conduct of the parties measures the existence of a contract between them. In short, it is the bargain in fact, not the subjective intent of the parties which is critical. In support of its theory of an oral/contract, the seller presented testimony that the common course of dealing between the two parties included consummating deals over the telephone. With respect to the disagreement over the subject matter of the contract, Dr. Horvat produced evidence indicating that part “#900064” was customarily ordered in much larger quantities than part “#009697,” quantities comparable to the order at issue. In addition, Dr. Horvat testified that a “revision letter” was added to the internal order confirmation. This action, according to Horvat would apparently not have been taken if the part had not *68 been modified. Part “#900064” was changed; Part “#009697” was not changed. Finally, strengthening both the credibility of the buyers witness and the identification of the part ordered is Pachico’s recollection that the 199 parts he ordered would initially have cost in the range of “#900064” transformers, but that increasing his order to 250 parts depressed the per-item cost to the range of the “#009697” transformer. The change in price is an almost unconscionable 50% reduction in per-item price.
As noted above, the buyer relies entirely upon its written confirmation order to show that the transformer ordered was part “#009697.” Although the confirmation referenced the order number given over the phone, it does not necessarily follow that a new order was not intended. It has been held that an exchange of forms following an oral agreement does not prevent formation of a contract. Luria Bros. & Co. v. Pielet Bros. Scrap Iron, 600 F. 2d 103 (7th Cr. 1979). Here, the seller presented evidence that the writing varied materially from the oral order with respect to origination, price and part number. See, generally, G.L. c. 106, § 2-207 (2) (b) (material alteration of terms does not become part of the contract). It was also uncontested that orders were sometimes placed directly by this form without any oral corroboration. Significantly, the seller apparently proceeded with the order as if it created a second contract. In sum, our review of the evidence does not show any error of law regarding the initial making of the contract. The trial judge who judged the credibility of the witnesses was entitled to find that the determinative facts' generated two agreements and were not simply diverse parts of one single agreement. Accordingly, again, we believe that a contract was created. The buyer made an oral offer to buy the “#900064” transformer and the seller accepted the order, both verbally and by acting in accordance with the contract. G.L. c. 106 § 2-206.
Also supporting the trial judge’s findings that an enforceable contract éxists is the notion expressed by the Code’s Statute of Frauds Section, G.L. c. 106 § 2-201 (1). Basically, this provision allows the use of extrinsic evidence to correct any error in a written confirmation. 1 ANDERSON, UNIFORM COMMERCIAL CODE, § 2-201:26 (2d ed. 1970). Therefore, if the trial court felt thatthe written confirmation referred to the initial contract but that an error as to the identity and price of the goods had been made, he was justified in evaluating both the testimony of the parties and their course of dealing. Furthermore, he was justified in ignoring the writing completely since it was, he believed, materially different. Luria Bros. Co. v. Pielet Bros. Scrap Iron, 600 F. 2d 103 (7th Cir. 1979).
The next contention made by the buyer is that the Statute of Frauds bars the enforcement of the instant contract. We disagree for the following reasons. G.L. c. 106, § 2-201 (1) provides that a contract for the sale of goods over $500.00 must be evidenced by a writing. There is no writing in this case and the contract is well over $500.00. Section 2-201 provides exceptions to the otherwise fatal requirements. Section 2-201 (3) provides: “A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable
(a) if the goods are to be specifically manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller’s business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement.”
Here we believe that the contract covers “specially manufactured goods” as *69 contemplated by Section 2-201 (3) (a). Transformer “A#900064” was “custom designed” for use by the buyer’s New Jersey subsidiary. Moreover, it is patently obvious that this transformer which was modified five times specifically for the buyer would be difficult for the seller to resell to other customers in the ordinary course of his business. Frank Adams and Co. v. Baker, 1 Ohio App. 3d 137, 439 N.E. 2d 953 (1981) (steel reinforcing rods deemed specially manufactured goods). Additionally, the seller has certainly satisfied the requirement that it must have had to have substantially begun manufacturing the goods before repudiation since “repudiation” was subsequent to delivery. Because we decide that the Statute of Frauds does not bar enforcement of this contract under the “specially manufactured” exception, we do not consider the seller’s claim that the goods were “received and accepted” under G.L. c. 106, § 2-201 (3) (c).
Although we believe, for the preceding reasons, that this case primarily turns upon the trial court’s factual determination that the initial oral contract covers part “#900064,” it is necessary to discuss Uniform Commercial Code issues raised by the trial court’s draft report which are also considered by the parties. These include, among others, the “Buyer’s rights on improper delivery,” G.L. c. 106, § 2-601; “Manner and effect of rightful rejection,” § 2-602; and “What constitutes acceptance of goods,” § 2-606.
G.L. c. 106, § 2-601 provides that “if the goods or tender of delivery fail in any respect to conform to the contract, the buyer may:
(a) reject the whole; or
(b) accept the whole; or
(c) accept any commercial unit or units and reject the rest.”
Under G.L. c. 106, § 2-106, “conforming” is defined in the following manner: “Goods or conduct including any part of a performance are ‘conforming’ or conform to the contract when they are in accordance with the obligations under the contract.” As we have stated elsewhere, the oral order and subsequent performance by the seller created a contract calling for the delivery of 250 transformers part “#900064.” In accord with its obligation thereunder, the seller delivered goods which conformed with the obligation. Consequently, Section 2-601 is, by definition, inapplicable since the “#900064” transformer conforms to the contract.
Since we hold that Section 2-601 is not applicable in this case, we must also find that G.L. c. 106, § 2-602 is inapposite because it governs the procedures for rightful rejection of goods. If Section 2-601 does not apply, the buyer may not “reject the whole” and as a result the manner and effect of any rejection is irrelevant since it is wrongful.
Neither may the buyer argue that it has not “accepted” the goods. In the comments to G.L. c. 106, § 2-606 it states: “(i)f the goods conform to the contract, acceptance amounts only to the performance by the buyer of one part of his legal obligation.” Therefore, just as the buyer must pay for goods which conform to the contract, G.L. c. 106, § 2-301, it is legally obliged to accept conforming goods. Id. Similarly, the buyer may not maintain that it revoked acceptance when the non-conformity of the lot or commercial unit “substantially impairs its value to him if he has accepted it...” In.the case at bar, we have decided that, by definition, the transformers delivered by the seller were not “non-conforming.”
It is plain that our determination that an oral contract between the parties for part “#900064” exists, legally precludes the buyer from acting in any manner other than to “accept and pay in accordance with the contract.” G.L. c. 106, § 2-301. The buyer’s failure to do so allows the seller to recover the price due, plus identifiable, incidental damages. G.L. c. 106, § 2-709.
*70 For all the preceding reasons we decline to overturn the trial court’s ruling in favor of the plaintiff-seller on the above issues. We do, however, emphasize that this decision is particularly influenced by the trial judge’s factual determination that part “#900064” was indeed the part ordered by the buyer. Once this finding is made under the Commercial Code, G.L. c. 106, § 1-101 et. seq., the collateral legal effects of this determination ineluctably flow.
For the foregoing reasons we conclude that the determination of the trial court was correct and accordingly the Report must be dismissed. It is so ordered.

 An important point in this respect is the fact that at this time 250 transformers, part “#009697” sold for $17.17 each while 250 transformers, part “#900064” cost $35.50 each. Pachico testified that he originally wanted 199 transformers, part “#009697” but that he changed the order to 250 because the price for 199 was $35.50 apiece while 250 cost $16.00 each.